**Dale E. MCCORMICK, Plaintiff,**

v.

**CITY OF LAWRENCE, KANSAS, et. al. Defendants.**

**No. 02–2135–JWL.**

United States District Court, D. Kansas.

March 31, 2003.

Gerald L. Cooley, Randall F. Larkin, Allen & Cooley, Lawrence, KS, for City of Lawrence, Kansas.

M. J. Willoughby, Office of Attorney General, Topeka, KS, for Defendants.

### MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

This action involves multiple 42 U.S.C. § 1983 claims Dale E. McCormick has brought against government officials of both the City of Lawrence, Kansas and the State of Kansas in their individual capacities, alleging that they have violated his constitutional rights on a number of occasions. More specifically, Mr. McCormick alleges three broad groups of government officials as well as the City of Lawrence violated his constitutional rights. First, he alleges police officers of the City of Lawrence—Vince Casagrande, Gil Crouse, James White, Leo Souders, Chris Mann, Ken Farrar, Mike Byrn, Susan Hadl, Sam Harvey, and officers referred to as John Doe 1 and John Doe 3—retaliated against him for exercising his First Amendment rights (as well as violated his constitutional rights in other ways) on numerous occasions, usually when he was protesting traf-

fic stops. Second, he alleges Douglas County District Attorney Christine Kenney and Assistant District Attorney Brad Burke conspired with Officer James White to fabricate evidence on which to base a criminal charge in retaliation for Mr. McCormick exercising his constitutional rights. Third, he alleges Assistant Attorney General M.J. Willoughby fabricated evidence on which to base a complaint she filed with the Consumer Protection Division of the Office of the Kansas Attorney General contending Mr. McCormick was practicing law without a license. Also, he alleges two agents in the Consumer Protection Division, David Harder and Shelly Welch, subpoenaed a witness and harassed her regarding her association with Mr. McCormick in retaliation for Mr. McCormick's exercise of his First Amendment rights. Finally, he alleges the City of Lawrence implemented and maintained an unconstitutional policy or custom in its police force of encouraging officers to prohibit or impede First Amendment rights.

The matter is currently before the court on the following defendants' motions to dismiss: Vince Casagrande (Doc. 28), Ken Farrar and Mike Byrn (Doc. 30), the City of Lawrence, Kansas (Doc. 34), James White and Leo Souder (Doc. 36), Sam Harvey and Susan Hadl (Doc. 40), Gerard Little (Doc. 42), Gil Crouse (Doc. 44), Chris Mann (Doc. 46), Christine Kenney and Bradley Burke (Doc. 52), and M.J. Willoughby, David Harder, and Shelly Welch (Doc. 58). The matter is also before the court on Mr. McCormick's motion

for summary judgment (Doc. 20).[1] For the reasons set forth in detail below, the motions are granted in part and denied in part. More specifically, Mr. McCormick's motion for summary judgment is denied.[2] The defendants' motions to dismiss are granted as to Gerard Little, Christine Kenney, Bradley Burke, David Harder, Shelly Welch, and Vince Casagrande. They are granted in part and denied in part as to James White, Leo Souder, and M.J. Willoughby. Finally, they are denied as to Gil Crouse, Chris Mann, Ken Farrar, Mike Byrn, Susan Hadl, Sam Harvey, and the City of Lawrence.

### I. 12(b)(6) Motion to Dismiss Standard

The court will dismiss a cause of action for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his [or her] claims which would entitle him [or her] to relief," *Poole v. County of Otero,* 271 F.3d 955, 957 (10th Cir.2001) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), or when an issue of law is dispositive. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Smith v. Plati,* 258 F.3d 1167, 1174 (10th Cir.2001). The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the

---

1. Mr. McCormick filed his motion for summary judgment at the beginning of June, 2002. The motions to dismiss were filed at the end of June and the beginning of July, 2002. Mr. McCormick subsequently filed several motions to amend his first amended complaint, and the court informed the parties that it would not address the motions to dismiss or motion for summary judgment until the motions to amend were decided. The magistrate

judge recently denied Mr. McCormick's most recent motion to amend.

2. The court denies Mr. McCormick's summary judgment motion without more discussion because it is clear that each of the claims involves genuine issues of material fact. The court will deny the motion without prejudice. Thus, Mr. McCormick is free to reassert his motion at a time when the factual record is more complete.

claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

When, as here, a plaintiff is proceeding pro se, the court construes his or her pleadings liberally and holds the pleadings to a less stringent standard than formal pleadings drafted by lawyers. *McBride v. Deer*, 240 F.3d 1287, 1290 (10th Cir.2001); *accord Shaffer v. Saffle*, 148 F.3d 1180, 1181 (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991)). In other words, "[n]ot every fact must be described in specific detail, ... and the plaintiff whose factual allegations are close to stating a claim but are missing some important element that may not have occurred to him should be allowed to amend his complaint." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir.1996) (quoting *Hall*, 935 F.2d at 1110). The liberal construction of the plaintiff's complaint, however, "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.* (quoting *Hall*, 935 F.2d at 1110). "Conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Id.* (quoting *Hall*, 935 F.2d at 1110).

## II. Allegations in the First Amended Complaint

The following allegations are set out in Mr. McCormick's *pro se* first amended complaint.[3] Of course, on a motion to dismiss pursuant to Rule 12(b)(6), the only facts considered by the court are those contained in the plaintiff's complaint or documents attached as exhibits to the com-

plaint. *Oxendine v. Kaplan*, 241 F.3d 1272, 1274 (10th Cir.2001) (stating that in deciding a Rule 12(b)(6) motion, "a court may look both to the complaint itself and to any documents attached as exhibits to the complaint"). His allegations set forth his version of the events that occurred in Lawrence, Kansas at the end of 2001 and beginning of 2002 giving rise to this litigation. The court divided the allegations into eight different incidents, and, in keeping with the applicable standard under Rule 12(b)(6), assumes as true any well pleaded facts in those allegations for the purposes of deciding these motions.

*Confrontation at Mr. McCormick's House*

On December 27, 2001, Mr. McCormick drove home to find a "police-cruiser," with no emergency or other lights on, parked on the street blocking his entire driveway. Mr. McCormick put his turn signal on and waited for the "cruiser" to move. After the cruiser did not move, Mr. McCormick began honking his horn in an attempt to prod the cruiser to move. After a short while the cruiser moved in reverse, out of the path of Mr. McCormick's driveway, and Mr. McCormick pulled into his driveway. Mr. McCormick then took his briefcase and other items inside his house and went back outside to find out why the cruiser was parked in front of his driveway. Mr. McCormick asked Officer Gil Crouse why he was illegally parked in front of Mr. McCormick's driveway. Officer Crouse responded: "I know the law better than you, and I was not illegally parked." Mr. McCormick responded by calling Officer Crouse a "cognitively impotent pig," and "instructed [Officer] Crouse that it most certainly was not lawful for [him] to park blocking [Mr. McCormick's]

---

**3.** Although Mr. McCormick has filed at least two motions to amend his first amended complaint and at least one of those motions has been granted, Mr. McCormick has not filed a second amended complaint. Thus, as Magistrate Judge O'Hara stated in a recent order (Doc. 173), the first amended complaint is controlling.

driveway, absent some emergency, of which there was obviously none at hand." Officer Crouse responded by saying words to the effect of: "You better watch it or this pig is going to take you to jail."

Mr. McCormick then told Officer Crouse to wait one minute, and he went inside his house to get his video camera. Several moments later, he made "peaceful (albeit perhaps crude) verbal expressions"—calling Officer Crouse a pig. In response, Officer Crouse, talking directly into Mr. McCormick's video camera, threatened to take Mr. McCormick to jail. Mr. McCormick alleges the threats of arrest and incarceration caused Mr. McCormick "immediate fear and apprehension of losing his very Liberty for making simple expressions from the curtilage of his home, and provoked [Mr. McCormick] to wrath, as [his] video shows."

Shortly thereafter, Mr. McCormick went to his neighbor's house and asked the neighbor to videotape the incident if Mr. McCormick's camera was taken. Soon, two more "police-cruisers" arrived in front of Mr. McCormick's house. The officers conferred with Officer Crouse for several minutes, then went back to their vehicles and left the scene. Mr. Crouse remained parked in front of Mr. McCormick's house for approximately the next half hour, then left briefly, then returned for approximately 15 minutes, then left and did not return.

*Confrontation on the University of Kansas Campus*

On January 1, 2002, at or around 10:30 a.m., Mr. McCormick approached a "police-cruiser," parked in the middle of the street with no emergency lights or blinker on. He was in the South-bound lane heading South in his vehicle, around the 900 block, on Mississippi Street in Lawrence. As he slowed down and went around the cruiser via the North-bound lane, he honked at the cruiser. Officer Vince Casagrande, who was in the cruiser, "cast an angry looking scowl at [Mr. McCormick,] apparently in response to [Mr. McCormick] honking [his] vehicle's horn." Seeing the scowl, Mr. McCormick "flipped the bird" to Officer Casagrande (mostly to "test" his First Amendment rights), and continued doing so until he was a block or more away. Mr. McCormick then proceeded South on Mississippi Street for approximately half a mile to the University of Kansas main campus where he parked his vehicle at the curb on the far west edge of parking lot 94 and prepared to depart his car to walk his dogs on the part of the campus known as Campanile Hill.

As Mr. McCormick put on his scarf and hat and prepared to exit his vehicle, he noticed that Officer Casagrande had parked his cruiser diagonally, several feet behind Mr. McCormick's vehicle, preventing Mr. McCormick from reversing his vehicle. Mr. McCormick picked up his micro cassette recorder and he and Officer Casagrande exited their respective vehicles simultaneously. Officer Casagrande then asked Mr. McCormick: "Do you have some kind of problem with me?" To which Mr. McCormick responded: "Well, I didn't; but I do now. Just what the hell do you think you're seizing me for?" Officer Casagrande then made comments about Mr. McCormick taking an "attitude" with him and he stated that he could "arrest" Mr. McCormick. Mr. McCormick alleges that the threat of arrest caused him "immediate apprehension and fear of losing his Liberty for making simple, protected expressions of his opinion."

After overcoming this fear of arrest, Mr. McCormick—alleging that he was aware that Officer Casagrande was simply harassing him for "flipping Casagrande 'the bird'" and that certain types of police officers are not professional enough to remain calm when insulted—called Officer Casagrande a "sick pig" and told him:

"you'd better get your pig ass out of here before you get in more trouble." This infuriated Officer Casagrande, who then assumed a hostile and threatening stance within six inches of Mr. McCormick and yelled: "Oh, you wanna talk some shit, huh? I can talk some shit, too, motherfucker." Mr. McCormick alleges this response "mortified" him and caused him to stop expressing his opinion.

But after "gathering his wits," Mr. McCormick informed Officer Casagrande that he would be sued for retaliating against Mr. McCormick for expressing his First Amendment rights and seizing Mr. McCormick in a "patently unreasonable manner." Officer Casagrande then backed away several feet and asked Mr. McCormick: "Why do you have such a problem with us?" (as Mr. McCormick notes, presumably in regard to his "perpetual protesting and heckling of police activities in Lawrence"). Mr. McCormick responded that the officer "was not 'cognitively capable of grasping' the answer to his question, and so [he] would not 'waste [his] breath' answering the same." Mr. McCormick then walked way from the scene to walk his dogs and Officer Casagrande got in his vehicle and left.

*Protesting Police Stop on New Jersey Street*

On January 9, 2002, at or about 11:00 p.m., Mr. McCormick was protesting a traffic stop, which he alleges was a lawful protest pursuant to *Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), from a public sidewalk at or about 11th and New Jersey in Lawrence. The stop was being conducted by Lawrence Police Officer Chris Mann and an unidentified officer Mr. McCormick refers to as John Doe 1. Within moments of Mr. McCormick initiating his protest, the officers threatened to arrest him for making such oral expressions, specifically threatening to arrest him for obstruction of offi-

cial duty. Mr. McCormick alleges that these threats caused him "immediate apprehension and fear at losing his Liberty for making simple expressions." But he then "somewhat" overcame his apprehension and continued to heckle the officers, who shortly thereafter ended the traffic stop and departed.

Shortly after this encounter, Mr. McCormick was driving his vehicle through down town Lawrence when he noticed Officer Mann following him. Officer Mann activated his emergency lights and pulled Mr. McCormick over around 9th and Vermont in Lawrence. Officer Mann explained to Mr. McCormick, who taped the conversation on a micro-cassette recorder, that he pulled Mr. McCormick over because he hesitated when a traffic light turned green, and this gave Officer Mann probable cause to believe he was intoxicated. Officer Mann then found that Mr. McCormick was driving with a suspended driver's license (as explained below, Mr. McCormick's license was suspended because the City of Lawrence sent incorrect driver related information to the State of Kansas) and arrested and booked him for that offense. Mr. McCormick later posted bail and was out of jail by 3:00 a.m. the next day.

*Confrontation at the Lawrence Municipal Court Clerk's Office*

On January 10, 2002, at or about 10:00 a.m., approximately seven hours after getting out of jail, Mr. McCormick went to the Lawrence Municipal Court Clerk's Office to find out why incorrect driver related information was sent to the State of Kansas, thereby leading to his arrest, and to have proper information sent to the State of Kansas. Gerard Little, the Lawrence City Prosecutor, attempted to explain why such information was sent. Mr. McCormick, believing Mr. Little to be "directly lying" to him (as documented on his

micro-cassette recorder) became "greatly angered."

Officers Ken Farrar and Mike Byrn then arrived on the scene, and Mr. Little instructed them that Mr. McCormick was being "disorderly" and "profane" (which Mr. McCormick alleges his micro-cassette recording refutes) and told them he wanted Mr. McCormick to leave. The officers then began threatening to take Mr. McCormick to jail if he did not leave. Such threat, Mr. McCormick alleges, caused him "immediate apprehension and fear of losing his Liberty for trying to lawfully access the courts." After overcoming his apprehension, Mr. McCormick, "provoked to wrath at being lied to" and being threatened by the officers, began calling the officers "pigs" and other crude phrases, and specifically began calling Officer Farrar a "lying, amoral, unethical, perjurious piece of shit" (based on Mr. McCormick's past experiences with Officer Farrar). The officers then continued to threaten to arrest Mr. McCormick.

Finally, Mr. McCormick was able to talk to a clerk or deputy clerk at the municipal clerk window and have the clerk fax information to the State of Kansas correcting the erroneous information previously sent on November 27, 2001. Within thirty minutes the State of Kansas lifted Mr. McCormick's suspension and corrected his driving record. Mr. McCormick alleges that the only two non-government individuals that witnessed these events told Mr. McCormick they approved of his remarks to the officer and, therefore, were in no way disturbed or offended by his actions even though some of his "protected expressions were perhaps at times somewhat crude and distasteful."

*Protesting Police Stop on Massachusetts Street*

Later on January 10, 2002, Mr. McCormick again returned to his protest activities, this time protesting from a sidewalk at approximately 1050 Massachusetts Street in Lawrence a "traffic stop" being conducted by Officers James White and Leo Sounders. Mr. McCormick alleges that he was not uttering "fighting words" or disturbing the peace, but Officer White nonetheless threatened to arrest him for disorderly conduct if he continued communicating with the officers. In response, Mr. McCormick took his micro-cassette recorder out of his pocket, extended the device toward Officer White, and asked him to repeat his unlawful threat. In response, Officer White grabbed Mr. McCormick's hand and physically and forcefully took Mr. McCormick's recorder from him and shut off the device. Officer Souder and Officer Scott Chamberlain also grabbed Mr. McCormick against his will and in a manner which Mr. McCormick "found offensive, violent and aggressive." The officers then forcefully took Mr. McCormick into custody, placed him in handcuffs, placed him in a patrol car, and transported him to Douglas County jail, where Officer White had him "booked" for "disorderly conduct" and "interference with police duties."

Apparently after making bail or otherwise being released, Mr. McCormick requested that Office White return his recording device, explaining to Officer White that he had no lawful right to take the device and that such device was vital to Mr. McCormick's First Amendment activities. His request was denied, and as of March 12, 2002, two months later, the device had not been returned. But the charges against Mr. McCormick were dismissed by the City of Lawrence at Mr. McCormick's first appearance for such charges on or about January 30, 2002. Mr. McCormick alleges that he had conducted virtually no First Amendment activities between this arrest and the date he filed this complaint because he is "mortified that he will again be arrested for making simple expressive protests pursu-

ant to *Houston v. Hill,* and because [his] recording device has been confiscated, seized, unlawfully possessed by the government since such date."

*Protesting Police Stop on Haskell Street*

On April 14, 2002, at around 2:45 a.m., Mr. McCormick, who alleges he finally over came his fear of being unlawfully arrested for expressing his opinion, returned to his protesting activities, this time protesting a "traffic stop" from a sidewalk on about 13th and Haskell in Lawrence. Mr. McCormick alleges that he "greatly limited" his expressions due to his knowledge of the lawless nature of the Lawrence Police Department. Nonetheless, Officer Sam Harvey threatened to arrest Mr. McCormick, as documented by Mr. McCormick's video camera. Mr. McCormick alleges this threat of arrest caused him "immediate apprehension and fear at losing his Liberty for making simple expressions" and, consequently, caused him to stop making expressions to the officers.

Having been prevented from orally challenging the stop, Mr. McCormick, now allegedly on a journalistic endeavor, began questioning Officer Harvey whether he was trained by the Lawrence Police Department to arrest and threaten persons who exercise their First Amendment right to orally challenge police activity. Officer Harvey responded to Mr. McCormick's video camera that he had been so authorized and instructed by the Lawrence Police Department. After confirming several times that Officer Harvey had officially terminated his exercise of First Amendment rights by threatening to arrest Mr. McCormick, Mr. McCormick left the scene. Mr. McCormick alleges the threat of arrest frightened him to the point that he was shaking (as he alleges his video shows), humiliated and embarrassed, causing him "stress, anxiety, and consternation."

But ten minutes later, at or about 2:55 a.m., after Mr. McCormick returned to his home and was reminded by the vow posted on his wall of his "eternal hostility against every form of tyranny over the mind of man" (T. Jefferson), he alleges he overcame his fear of unlawful threats made by Officer Harvey and returned to the sidewalk to renew his oral opposition to the police activity. And Officer Harvey again threatened to arrest him, as documented by his video camera. In response, Mr. McCormick again agreed to stop his oral challenge of the police stop and then turned his attention to questioning Officer Harvey about the First Amendment. He also began "peacefully, verbally opposing and challenging [Officer] Harvey." In response, the officer in command of the scene, Sergeant Susan Hadl, approached Mr. McCormick and ordered him to stop communicating with Officer Harvey and leave the scene or be arrested. This "frightened" Mr. McCormick and provoked him "to wrath." He asked her whether she had heard of the First Amendment or *Houston v. Hill.* He also informed her and Officer Harvey that he "had a right to be on the public sidewalk expressing his opinion in an open public forum."

Officer Hadl then instructed Officer Harvey that Mr. McCormick was "10–15," and Officer Hadl took handcuffs out of her belt and told Mr. McCormick he was under arrest. Both officers then approached Mr. McCormick and began indicating that they were arresting him. At that point, Mr. McCormick, now "mortified" that his video recorder would be confiscated and not returned, "plead for his Liberty" and offered to leave the scene if they did not arrest him. He alleges that Officer Hadl responded by telling him to "put the videocamera down so it doesn't get broken" and continued to tell him he was under arrest. But after Mr. McCormick further "plead for his Liberty," they agreed not to arrest

him if he would leave the scene. Mr. McCormick alleges this provoked him to "maximum wrath," terminated his First Amendment rights, and caused him "grave stress, anxiety and consternation."

*Involvement in the Coburn Lawsuit*

At some point in the year 2001, Robert Coburn of Edgerton, Kansas contacted Mr. McCormick. Mr. Coburn explained that he believed his wife, Merrily Coburn, had been wronged by the government and was considering filing a lawsuit against the agents she believed wronged her. He also told Mr. McCormick he had read a case decided by the Kansas Court of Appeals—*McCormick v. Board of County Commissioners, et al.*, 28 Kan.App.2d 744, 24 P.3d 739 (2001)—in which Mr. McCormick partially prevailed in the same type of § 1983 claim the Coburns were considering filing. He asked Mr. McCormick whether he could direct the Coburns to sources of information which he used in his case and Mr. McCormick agreed to do so. In the months following this conversation, Mr. McCormick met with the Coburns to provide them with copies of legal decisions to photocopy and citations of cases to look up, to answer questions the Coburns had regarding the way and manner in which they could get the information needed to file their lawsuit *pro* se, and to discuss the history of the law and the fundamental principles upon which Kansas and the United States were founded—with these interactions leading to a friendship between Mr. McCormick and the Coburns. Ms. Coburn eventually filed her lawsuit in the United States District Court for the District of Kansas. Mr. McCormick acted as a process server for Ms. Coburn's complaint and several ensuing documents, but alleges that he otherwise took no part in her lawsuit or took any action on her behalf in any way.

In or about January, 2002, an Assistant Attorney General of Kansas, M.J. Wil-loughby, the attorney representing Mr. Nordeen in Ms. Coburn's lawsuit and the attorney who represented Cynthia J. Long in the Kansas Court of Appeals case described above, accused Mr. McCormick of drafting and writing documents filed by Ms. Coburn. Ms. Willoughby made the accusation in documents she filed on behalf of Mr. Nordeen in Ms. Coburn's lawsuit. Mr. McCormick states the accusation "is and was patently false," and it was made with no evidence to substantiate it. Mr. McCormick alleges that Ms. Willoughby also retaliated against him and the Coburns for their previous interactions by filing a complaint against Mr. McCormick with the Consumer Protection Division of the Office of the Kansas Attorney General for practicing law without a license. Thereafter, Ms. Willoughby "connived" with David Harder and Shelly Welch, two agents in the Consumer Protection Division of the Office of the Kansas Attorney General, to launch a "fabricated and baseless inquisition" into Mr. McCormick's interactions with the Coburns in order to "intimidate" the Coburns and Mr. McCormick, to interfere with their right of expression, to interfere with their right of petition, to harass them, to interfere with their right of association, and to "otherwise oppress" them in whatever way possible. .

After "so conniving," Ms. Willoughby, Mr. Harder and Ms. Welch subpoenaed Merrily Coburn to appear at an "inquisition" regarding Mr. McCormick's involvement in Ms. Coburn's case. During their inquiry, Mr. Harder and Ms. Welch repeatedly "lied" to Ms. Coburn regarding Mr. McCormick, "threatened" Ms. Coburn regarding her association with Mr. McCormick, "misrepresented the law" to Ms. Coburn, and "otherwise did everything in their power to prevent or dissuade Merrily Coburn and her husband from associating with [Mr. McCormick]."

These events caused the Coburns to stop associating with Mr. McCormick "for a time" out of fear of further retaliation and has since caused the Coburns to "almost entirely terminate their association" with Mr. McCormick because, based on their experiences, they believe the government "is bent" on preventing Mr. McCormick's Constitutional advocacy activities. Thus, Mr. McCormick alleges he has been denied his right to associate with the Coburns. He also alleges the above described actions, which he believes constitutes another instance in which the government has fabricated allegations and supposed evidence regarding him, "provoked [him] to wrath" and caused him "stress, anxiety, fear, consternation and feelings of oppression." Such actions also caused him to diminish or cease his activist efforts out of fear that he would be subpoenaed to appear before the Kansas Attorney General for an "inquisition."

*Initiation of a Criminal Charge by the Lawrence District Attorney's Office*

In or around March, 2002, Mr. McCormick alleges that Christine Kenney, Bradley Burke, James White, and "likely others unknowable to [Mr. McCormick] without discovery," made an agreement, expressly or impliedly, to retaliate against Mr. McCormick for exercising his First Amendment rights, to use harassing litigation to interfere with Mr. McCormick's access to the courts, and to deter Mr. McCormick from accessing the courts. Specifically, he alleges they used "false information" in an affidavit to initiate a criminal charge—disorderly conduct—

against him in case no. 02–cr–0527 in the District Court of Douglas County. Mr. McCormick sets out six particular facts in Officer White's affidavit which he believes are false. He also points out that they "conspired" to omit from the affidavit three material facts, including that Mr. McCormick made a micro-cassette recording of the events, Officer White took the recorder during the incident, the recorder has not been returned, and Officer White "destroyed, altered or adulterated the recordings."

After creating the "false affidavit," the conspirators caused Officer White to swear the affidavit under oath, and Mr. Burke "swore a complaint under oath," thereby instigating said false and falsely premised 'disorderly conduct' charge against [Mr. McCormick]." All of which caused Mr. McCormick to appear in court and defend himself against these charges.

Mr. McCormick alleges these actions: "provoked [him] to wrath;" deprived him of his Liberty in violation of clearly established law; caused him to feel "oppressed, frightened, sad;" "caused stress, anxiety and consternation" in him; and made him "scared to express his opinion or exercise other First Amendment rights."

### III. Analysis

Based on the allegations set forth in the first amendment complaint, Mr. McCormick brings twenty five § 1983 claims against government officials of the City of Lawrence and the State of Kansas in their individual capacities and one such claim against the City of Lawrence.[4]

---

**4.** Under 42 U.S.C. § 1983, a plaintiff must establish "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Colum-

bia." *Summum v. City of Ogden*, 297 F.3d 995, 1000–01 (10th Cir.2002) (quoting 1A Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 1.4, at 12 (3d ed.1997) (internal quotation marks and footnotes omitted)); *see also Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (providing a two-element formulation that en-

All of the named defendants have filed motions to dismiss. Gerard Little, the Lawrence City Prosecutor, argues that, although he is a named defendant and mentioned in the first amended complaint, no claim is actually made against him in that complaint. The police officers of the City of Lawrence—Vince Casagrande, Ken Farrar, Mike Byrn, James White, Leo Souder, Sam Harvey, Susan Hadl, Gil Crouse, and Chris Mann—argue they are entitled to qualified immunity. Officers White and Souder also argue some claims should be dismissed under *Heck v. Humphrey*. The City of Lawrence argues that Mr. McCormick has failed to allege a cognizable constitutional injury; thus, he fails to state a claim against the City of Lawrence. Christine Kenney and Bradley Burke argue they are entitled to absolute prosecutorial immunity or, alternatively, qualified immunity. M.J. Willoughby, David Harder, and Shelly Welch (the "Attorney General defendants") argue that Mr. McCormick does not have standing to bring claims against them. They also argue they are entitled to absolute immunity or, alternatively, qualified immunity. The court will address each of these arguments in turn.

## A. Motion to Dismiss Gerard Little

Gerard Little argues that he should be dismissed from this lawsuit because no claim is made against him in the first amended complaint. Mr. McCormick's response states that he filed a motion to amend his allegations against Mr. Little and added a First Amendment retaliation claim against Mr. Little. Mr. Little's reply points out that he never received a copy of a proposed amendment.

Subsequent to the parties filing their papers, Mr. McCormick filed a motion to amend his first amended complaint and included a proposed second amended complaint with his motion. Magistrate Judge O'Hara granted his motion to amend in part and this court upheld that decision.[5] Significantly, Mr. McCormick did not add a claim against Mr. Little in the proposed second amended complaint. Thus, Mr. McCormick has failed to plead a claim again Mr. Little and, consequently, the motion to dismiss is granted. Although normally the court would provide Mr. McCormick an opportunity to cure this deficiency, because Mr. McCormick did not include a claim against Mr. Little in the proposed second amended complaint after Mr. Little informed him of the deficiency in his first amended complaint, the court presumes Mr. McCormick chose not to include a claim against Mr. Little. Thus, the court dismisses the motion without leave to amend.

## B. Motions to Dismiss Police Officers of the City of Lawrence

The first amended complaint sets forth the following claims against police officers of the City of Lawrence arising from six encounters Mr. McCormick had with different officers: Count I is an "unreasonable seizure claim" and Count II is a retaliation claim, both against Officer Vince Casagrande stemming from the January 1, 2002 encounter on the University of Kansas campus. Count III is a retaliation claim against Officer Gil Crouse stemming from the December 27, 2001 encounter at Mr. McCormick's home. Count IV is a retaliation claim against Officers Chris Mann and John Doe 1 stemming from the

compasses each of the four elements just described).

5. The court notes that Mr. McCormick, however, did not file a second amended complaint consistent with this court's order. Thus, the first amended complaint remains controlling.

events surrounding the January 9, 2002 traffic stop protest. Count V is a retaliation claim against Officers Ken Farrar and Mike Byrn stemming from the January 10, 2002 encounter at the municipal court clerk's office. Count VI is a retaliation claim, Count VII is a "First (and Fourteenth) Amendment Free Speech" claim, and Count VIII is an "unreasonable seizure" claim, each against Officers James White and Leo Souder stemming from the events surrounding the January 10, 2002 traffic stop protest.[6] Count IX is an "unreasonable seizure" claim and Count X is a "taking property without due process" claim, both against Officer James White for confiscating Mr. McCormick's microcassette recorder during the January 10, 2002 traffic stop protest. Count XVI is a retaliation claim and Count XVII is a "free speech" claim, both stemming from the first encounter, at 2:45 a.m., of the January 9, 2002 traffic stop protest. Count XVIII is a retaliation claim and Count XIX is a "free speech" claim, both stemming from the second encounter, at 2:55 a.m., of the January 9, 2002 traffic stop protest. Count XX is a retaliation claim and Count XXI is a "free speech" claim, both stemming from the continued encounter, at 3:00 a.m., of the January 9, 2002 traffic stop protest.

### 1. Qualified Immunity

 All of the officers have filed motions to dismiss on the basis of qualified immunity. Qualified immunity safeguards government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir.1998) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The purpose of qualified immunity is to avoid excessive disruption of governmental functions and to dispose of frivolous claims in the early stages of litigation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). It "protects all but the plainly incompetent or those who knowingly violate the law." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (internal quotations and citations omitted). It is "an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Consequently, the Supreme Court has explained "that courts should resolve the 'purely legal question,' *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), raised by a qualified immunity defense 'at the earliest possible stage in litigation.'" *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir.1995) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

"Once a defendant raises the defense of qualified immunity in the context of a motion to dismiss, a court must first determine whether the plaintiff has asserted a violation of federal law." *Currier v. Doran*, 242 F.3d 905, 917 (10th Cir.2001), *cert. denied*, 534 U.S. 1019, 122 S.Ct. 543, 151 L.Ed.2d 421, 70 U.S.L.W. 3163 (U.S. Nov. 13, 2001) (No. 01–382), and *cert. denied*, 534 U.S. 1019, 122 S.Ct. 543, 151 L.Ed.2d 421, 70 U.S.L.W. 3270 (U.S. Nov. 13, 2001) (No. 01–551). Such a determination is made under the ordinary motion to dismiss standard: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

---

**6.** The latter two claims were also against Officer Scott Chamberlain; however, he has now been dismissed from the case by the plaintiff voluntarily.

claim which would entitle him to relief." *Id.* (quoting *Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, the Supreme Court instructed lower courts to always first ask whether a constitutional violation has occurred; otherwise, the body of law regarding constitutional violations may be deprived of development. *Id.*

If the plaintiff fails to meet his or her initial burden of alleging a constitutional violation, "there is no necessity for further inquires concerning qualified immunity." *Id.* If, on the other hand, he or she has pled allegations, that if proven, amount to a constitutional violation, "the next sequential step is to ask whether the right was clearly established at the time of the defendant's unlawful conduct." *Id.* That is, "the plaintiff must prove the right was sufficiently clear that a reasonable official would have understood that his [or her] conduct violated the right." *Id.* "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201, 121 S.Ct. 2151.[7]

### a. Constitutional Violations

Mr. McCormick's claims against the police officers can be grouped broadly into four different types of claims: unlawful seizure claims, First Amendment retaliation claims, First Amendment free speech claims, and a taking property without due process claim. The court will analyze each of the types of claims in turn.

### i. Unreasonable Seizure Claims

The Fourth Amendment protects citizens from unreasonable searches and seizures by government actors. *United*

States v. Sanchez, 89 F.3d 715, 717 (10th Cir.1996). Not all interaction between a police officer and a citizen amount to a seizure. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). A seizure does not occur merely because a police officer addresses an individual and asks a few questions. *Id.* As long as "a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Id.* (internal quotations and citation omitted). That is, an "encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Id.*

The Supreme Court noted in *Bostick* that "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* at 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (internal quotations omitted). The test is an objective one. *Sanchez,* 89 F.3d at 717. In other words, "[t]he subjective intention or state of mind of either the [individual] or police is irrelevant. . . ." *Id.*

Applying such a test is nonetheless difficult. The Tenth Circuit has helped ease the task by identifying the following factors that could lead a reasonable innocent person to believe that he or she is not free to disregard a police officer:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's per-

---

**7.** The court notes that because this is a motion to dismiss, on any claim in which qualified immunity is not granted, the defendants may reassert their entitlement to qualified immunity at summary judgment, but only if the defendants can show that Mr. McCormick's allegations in the complaint proved to be unfounded. *Seamons v. Snow,* 206 F.3d 1021, 1029 (10th Cir.2000).

sonal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.

*Id.* at 718.

In this action, Mr. McCormick has three different unreasonable seizure claims arising from two different encounters with police officers of the City of Lawrence.[8]

### Count I—Confrontation on the University of Kansas Campus

■ This claim, as described in detail above, alleges that Officer Casagrande seized Mr. McCormick when the officer followed him to the University of Kansas Campus, blocked his car, and confronted him. Officer Casagrande argues that only one of the factors set out by the Tenth Circuit was present; therefore, Mr. McCormick was not seized. Indeed, Officer Casagrande approached Mr. McCormick alone. He did not brandish a weapon, touch Mr. McCormick, retain any of Mr. McCormick's personal effects, or request that Mr. McCormick do anything. The interaction occurred in broad daylight in a public parking lot with, according to the first amended complaint, a "line of sight ... extend[ing] hundreds of yards in each direction." Only the fact that Mr. McCormick alleged that "there was not a person in sight..." cuts in favor of Mr. McCormick.

On the other hand, Mr. McCormick points out that he considered himself

seized because, according to his allegations, Officer Casagrande's car was parked "several feet behind [his vehicle], in a manner such that [he] would not be able to reverse his vehicle [to leave] if [he] so desired." He also points to his allegation that Officer Casagrande "assumed a hostile and threatening stance within six inches of [him] and yelled [profanities at him]."

As Officer Casagrande points out, however, the test is not subjective. Thus, whether Mr. McCormick felt seized does not factor into the court's analysis. Also, in response to the allegation that Mr. McCormick's car was blocked, Officer Casagrande refers the court to two Ninth Circuit cases that held that an individual is not seized when his or her vehicle is partially blocked by police cars if he or she is free to leave on foot. *United States v. Summers,* 268 F.3d 683 (9th Cir.2001); *United States v. Kim,* 25 F.3d 1426, 1431 n. 2 (9th Cir.1994).

Mr. McCormick concedes in his papers that these two cases "raise a few questions," but he seeks to distinguish their facts and notes that they are Ninth Circuit cases that are not controlling. Although Mr. McCormick is correct that the cases are from the Ninth Circuit, in the absence of Supreme Court or Tenth Circuit authority, the court looks to other circuit opinions as persuasive authority.[9] The court also does not find Mr. McCormick's factual distinction persuasive. He points out that he has alleged that Officer Casagrande was

---

**8.** Mr. McCormick also brought an unreasonable seizure claim—along with a conspiracy claim, a deprivation of Liberty by fabricated evidence claim, retaliatory and harassing prosecution claim, and an access to courts claim—against Officer White, Bradley Burke, and Christine Kenney, relating to their alleged conspiracy to fabricate evidence in conjunction with charges brought against Mr. McCormick relating to the events of January 10, 2002. The court will address Officer

White's motion to dismiss each of those claims (Counts XXII—XXVI) in the section addressing Mr. Burke and Ms. Kenney's motion to dismiss.

**9.** The only case Mr. McCormick cites to is a Kansas state court case stating a much more general proposition. Plus, on a federal claim such as this, Kansas law is of course not controlling.

six inches from him and yelling at him; thus, he was much more constrained than the individuals in the two Ninth Circuit cases. While this is true, Mr. McCormick neglects to mention that he previously alleged that Officer Casagrande assumed that position only after Mr. McCormick called him a "sick pig" and told him: "Get your pig ass out of here before you get in more trouble." Moreover, Mr. McCormick alleges that he eventually walked away from the scene to walk his dogs.

Taking into account all of the circumstances surrounding the encounter, the court concludes that the police conduct would not have communicated to a reasonable person that he or she was not at liberty to ignore the police presence and go about his or her business. Only one of the factors set forth by the Tenth Circuit was present (absence of other members of the public). Although it is true that Officer Casagrande blocked Mr. McCormick's car, Mr. McCormick had already parked and was getting ready to exit his vehicle. Moreover, Officer Casagrande did not activate his emergency lights or use other means to pull Mr. McCormick over. Mr. McCormick was already parked. Also, once Mr. McCormick exited his vehicle, Officer Casagrande did not ask him for identification. Instead, he asked Mr. McCormick if he had a problem with him. Mr. McCormick said he did not before but he did now. Officer Casagrande then said something to the effect that Mr. McCormick was taking an attitude with "him" and he could arrest him. Up until that point, a reasonable person would have felt free to leave and go about his or her business. But Mr. McCormick did not leave. Instead, he called Officer Casagrande a "sick pig" and told his "pig ass" to leave "before you get in more trouble." Officer Casagrande then assumed a hostile and threatening stance six inches from Mr. McCormick. It is at this point that Mr. McCormick alleges that he was not free to leave. However, when he told the officer he was going to sue him, the officer stepped away and Mr. McCormick eventually left to go walk his dogs. Thus, while it is true that Officer Casagrande probably invaded Mr. McCormick's personal space for a short period of time, that act alone is not sufficient to constitute a seizure.

In sum, the court concludes that even if Mr. McCormick is able to prove the allegations in his first amended complaint, such allegations do not establish that Officer Casagrande seized him. Thus, the court grants Officer Casagrande's motion to dismiss this claim.

### Count VIII and Count IX—Protesting Police Stop on Massachusetts Street

In Count VIII, Mr. McCormick alleges that Officers James White and Leo Souder did, "knowingly and intentionally," seize Mr. McCormick without probable cause to believe he had committed a crime.[10] He adds that he was arrested merely for making protected expressions from an open public forum. In Count IX, Mr. McCormick alleges that Officer White seized his micro-cassette recording device without probable cause to believe it was contraband, a weapon, or evidence of a crime.[11]

---

10. The court notes that Mr. McCormick's claim is sometimes more commonly referred to as an unconstitutional arrest or illegal arrest. "Unconstitutional arrests are unreasonable seizures of the person that violate the Fourth and Fourteenth Amendments." *Rose v. Mitchell,* 443 U.S. 545, 577, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979).

11. Officers White and Souder state they are unsure whether to characterize Mr. McCormick's unreasonable seizure claim relating to his micro-cassette recorder (Count IX) as a due process claim or a Fourth Amendment claim. Mr. McCormick's response clarifies that the claim is a Fourth Amendment claim. The officers argue that if it is a due process claim, then it should be dismissed under *Heck*

Officers White and Souder do not dispute that Mr. McCormick was seized. Indeed, it is undisputed that Mr. McCormick was arrested for "disorderly conduct" and "interference with police duties." Instead, they seek to dismiss both claims because they argue the claims are in essence attacking the constitutionality of the criminal case pending against Mr. McCormick in state court. According to them, this means any decision in favor of Mr. McCormick might undermine, if not defeat, the criminal case in state court. Thus, under a doctrine enunciated in *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), they seek to dismiss.

In *Heck*, the plaintiff, a state prisoner, was convicted of killing his wife. While his habeas corpus claim was on appeal, he filed a § 1983 suit against the prosecutor, alleging constitutional deprivations which led to his arrest and conviction. He asked for money damages and not for a reconsideration of his conviction or release from prison. The Supreme Court held that in order to recover damages for an allegedly unconstitutional conviction or imprisonment (or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid), a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. *Id.* at 486–87, 114 S.Ct. 2364. As a result, a claim for damages "necessarily implying" the invalidity of a conviction or sentence that has not previously been invalidated is not cognizable under § 1983. *Id.* at 487, 114 S.Ct. 2364.

The Supreme Court in *Heck* did not directly address the situation of a plaintiff who brings his § 1983 case prior to the completion of his criminal case. Circuit courts, however, have applied *Heck* to pending charges. *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir.1999); *Washington v. Summerville*, 127 F.3d 552, 555–56 (7th Cir.1997), *cert. denied*, 523 U.S. 1073, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998); *Smith v. Holtz*, 87 F.3d 108, 112–13 (3d Cir.1996). Indeed, the Tenth Circuit has held that *Heck* should apply to such situations when the concerns underlying *Heck* exist. *Beck v. City of Muskogee Police Dept.*, 195 F.3d 553, 557 (10th Cir. 1999) (citations omitted). More specifically, the court held that "*Heck* precludes § 1983 claims relating to pending charges when a judgment in favor of the plaintiff would necessarily imply the invalidity of any conviction or sentence that might result from prosecution of the pending charges." *Id.* at 557; *see also, Heck*, 512 U.S. at 487 n. 8, 114 S.Ct. 2364 (suggesting that "if a state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal trial, appeal, or state habeas action, abstention may be an appropriate response to the parallel state-court proceedings.") (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Consequently, "such claims arise at the time the charges are dismissed." *Id.*

In this action, Officers White and Souder urge the court to dismiss these claims until the criminal trial runs its course. The issue, then, is whether a judgment in favor of Mr. McCormick on either of these two claims would necessarily imply the invalidity of any conviction or sentence that might result from prosecution of the pending charges. In *Beck*, the Tenth Circuit explained that *Heck* generally does not apply to claims arising out of police

---

*v. Humphrey*. Thus, the court will group the two unreasonable seizure claims together and

discuss the application of *Heck v. Humphrey* as to both claims.

actions toward a criminal suspect, such as arrest, interrogation, or search and seizure. 195 F.3d at 558.[12] The court noted that some courts have held that *Heck* would apply in the rare situation where the only evidence against the defendant was obtained as a result of an illegal search, but it stated that it generally disagreed with the reasoning of such courts. *Id.* Here, like in *Beck*, the court is not confronted with the issue because the officers do not allege that the only evidence against Mr. McCormick is the seized micro-cassette recorder. Moreover, the officers have not provided any explanation as to why obtaining a judgment on the unreasonable seizure claims would necessarily imply the invalidity of any conviction that might result from prosecution of the pending charges. Accordingly, the court concludes that *Heck* does not apply to these two claims. Because the officers do not otherwise challenge Mr. McCormick's two unreasonable seizure claims, the court concludes that their motion to dismiss these two claims should be denied.

### ii. First Amendment Retaliation Claims

"[T]he purpose behind the Bill of Rights, and of the First Amendment in particular [,is] to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Thus, "the First Amendment bars retaliation for protected speech." *Crawford–El v. Britton,* 523 U.S. 574, 592, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). In fact, "[a]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harass-

ment, constitutes an infringement of that freedom." *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir.2000).

■ First Amendment retaliation claims are generally, but not always, brought in the public employment context. 44 Fed. Appx. 896, 902–03, 2002 WL 1788529, at *5 (10th Cir.2002) (citing *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). In this case, Mr. McCormick is not an employee of the defendants and no contractual relationship exists between the parties. The court, therefore, employs the substantive standard announced by the Tenth Circuit in *Worrell v. Henry,* 219 F.3d 1197 (10th Cir.2000), *cert. denied,* 533 U.S. 916, 121 S.Ct. 2521, 150 L.Ed.2d 693 (2001). *Worrell* recognized "an alternative to the *Pickering* balancing is warranted when allegations of retaliatory conduct are directed at a defendant who is not the plaintiff's employer and when there is no contractual relationship between them." *Worrell,* 219 F.3d at 1212.

[The test] require[s] proof of the following elements: (1) that the plaintiff 'was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'

*Worrell,* 219 F.3d at 1212 (quoting *Lackey,* 1999 WL 2461, at *3).

In this action, Mr. McCormick has eight different retaliation claims arising from six

---

12. This is consistent with the notion that even though an unconstitutional arrest is an unreasonable seizure that is unconstitutional, "an illegal arrest or detention does not void a subsequent conviction." *Rose,* 443 U.S. at 576, 99 S.Ct. 2993.

different encounters with various police officers of the City of Lawrence. Count II arises from the confrontation with Officer Casagrande on the University of Kansas campus, Count III arises from the confrontation with Officer Crouse at Mr. McCormick's house, Count IV arises from the police response to his protest on New Jersey Street, Count V arises from the confrontation at the Lawrence Municipal Court Clerk's Office, Count VI arises from the police response to his protest on Massachusetts Street, and Counts XVI, XVIII, and XX arise from the police response to his protest on New Jersey Street.

The circumstances surrounding each of these confrontations with the police, as alleged in the first amended complaint, are outlined in detail above. For purposes of this motion to dismiss, the circumstances regarding each claim (with the exception of Count II—the claim against Officer Casagrande) have a common thread: Mr. McCormick alleges he was engaged in an activity protected by the First Amendment (either protesting police stops or challenging police action), the police threatened to arrest him, and he either left the scene or stopped engaging in such activities. He alleges that the officers' threats of arrest were in response to his First Amendment activities (either protests or challenges to their authority). Thus, at this stage in the litigation, Mr. McCormick's allegations regarding each event do support a retaliation claim. Rather than apply the three part *Worrell* test to each claim individually, then, the court will group the officers arguments together and address them collectively under each prong of the *Worrell* test. Because the court believes that the circumstances involved in Count II, the retaliation claim against Officer Casagrande, are factually distinct and do not support a constitutional violation, the court

will address that claim individually after addressing the other claims.

█ Prior to doing so, however, the court must address Officers Harvey and Hadl's argument that Mr. McCormick cannot bring three different retaliation claims arising out of one confrontation they had with him over a twenty minute period. They argue such claims are duplicative.[13] Mr. McCormick points out that he alleges he initiated his protesting at 2:45 a.m. but left the scene unable to express his opinion because of the threatened arrest. He returned, however, at 2:55 a.m. and again renewed his protested. But again his protesting was terminated by threats of arrest, first by Officer Harvey then by Officer Hadl. Thus, he argues he has three separate claims based on three separate threats. The officers reply that Mr. McCormick cannot multiply his causes of action simply by leaving the scene and then returning to subject himself to the same alleged misconduct.

The court agrees with the officers and concludes that Mr. McCormick should be limited to one claim against both Officer Hadl and Officer Harvey. It was the collective effect of their threats of arrest that deterred Mr. McCormick's speech and therefore gave rise to his single injury. *Cf. H.E. Butt Grocery Co. v. National Union Fire Ins. Co.,* 150 F.3d 526, 534 (5th Cir.1998) (applying proximate cause tort analysis to insurance dispute in asking whether there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage). Put another way, the court would conclude that any injury Mr. McCormick suffered from the 2:45 a.m. threat of arrest standing alone was de minimis because he was back protesting ten minutes later. Also,

---

**13.** They also argue that the retaliation claims and the three Free Speech claims are duplica- tive. The court will address the argument with the Free Speech claims below.

the two threats of arrest around 2:55 a.m. were so close in time and interrelated that Mr. McCormick cannot claim two injuries. Thus, the court will conduct its analysis as if Mr. McCormick brought only one claim against both officers.

### Protected Activity

█ Now the court turns its attention to the arguments the officers make regarding why Mr. McCormick's actions did not constitute protected activity—the first element of the *Worrell* test. *Worrell*, 219 F.3d at 1212. While they concede that most forms of expression are protected from government censure by the First Amendment, they argue that during several of the confrontations or protests Mr. McCormick engaged in an unprotected form of speech or expression—fighting words. Mr. McCormick disputes that his actions constituted fighting words, arguing that the officers' authorities are outdated in light of *Houston v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). He argues that the Supreme Court case brought about a "fundamental change in the law." In reply, the officers contend that Mr. McCormick reads *Hill* too broadly and note that *Hill* is an overbreadth case.

Although the officers are correct that *Hill* involved a facial challenge to an ordinance instead of a police officer's actions, the Court's reasoning has been applied to the latter situation by numerous courts. *See, e.g., Sweatt v. Bailey*, 876 F.Supp. 1571 (M.D.Ala.1995) (applying *Hill* to § 1983 retaliation claim by a prisoner who claimed he was beaten while in detention for calling an officer an "ass"); *Nichols v. Chacon*, 110 F.Supp.2d 1099 (W.D.Ark. 2000) (discussing *Hill* in § 1983 retaliation claim by a person who was ticketed for making an offensive gesture at an officer).

In *Hill*, 482 U.S. at 460–67, 107 S.Ct. 2502, the Supreme Court found an ordinance prohibiting oral interruptions of police officers unconstitutionally overbroad. *Id.* In reaching this result, the Court stated that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Id.* at 461, 107 S.Ct. 2502. The Court added: "Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)). To illustrate its point, the Court explained that in *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), it vacated the conviction of a woman who was found to have yelled threats and obscenities at an officer who asked her husband to produce his driver's license because the statute she was convicted under was overly broad. *Hill*, 482 U.S. at 461–62, 107 S.Ct. 2502. The Court noted that critical to its decision was the fact the ordinance was not limited to "fighting words that 'by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Id.* at 462, 107 S.Ct. 2502 (quoting *Lewis*, 415 U.S. at 132, 94 S.Ct. 970). The Court added that in Justice Powell's concurring opinion in *Lewis*, he suggested that even the "fighting words" exception set forth in *Chaplinsky*, 315 U.S. at 568, 62 S.Ct. 766, "might require a narrower application in cases involving words addressed to a police officer, because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." *Id.* (internal quotations and citations omitted). Finally, the Court ended its analysis by noting: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the

principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63, 62 S.Ct. 766.

Subsequent to *Hill,* numerous courts have held that derogatory or profane remarks to police officers do not constitute fighting words. *See, e.g., L.A.T. v. State of Florida,* 650 So.2d 214, 217 (Fla.App.3d 1995) (collecting state law cases holding as such); *Nichols,* 110 F.Supp.2d at 1099 (discussing multiple federal cases holding as such). Of course, in determining whether words constitute fighting words, the circumstances surrounding the words are crucial. *Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974) (Powell, J., concurring) (observing that "words may or may not be 'fighting words' depending upon the circumstances of their utterance"); *Chaplinsky,* 315 U.S. at 568, 62 S.Ct. 766; *Lamar v. Banks,* 684 F.2d 714 (11th Cir.1982); *United States v. McKinney,* 9 Fed.Appx. 887, 888, 2001 WL 565745, at *1 (10th Cir. May 25, 2001)(unpublished decision).

At this stage in the litigation, the court is limited to considering only the allegations in Mr. McCormick's first amended complaint. The court also must make all reasonable inferences from those facts in favor of Mr. McCormick. Based on Mr. McCormick's allegations, as outlined above, the court is unable to say that Mr. McCormick's actions constitute fighting words as a matter of law. A trier of fact could reasonably find that Mr. McCormick's actions did not constitute fighting words. Although it is not clear from Mr. McCormick's complaint whether he was in close proximity to the officer when he was talking to them or whether he raised his voice while speaking, it appears clear that at no point was Mr. McCormick challenging the officers to a fight or otherwise provoking the officers to violence. Instead, he was usually protesting police traffic stops or informing officers of his opinion of them. While the court agrees that at times Mr. McCormick could have been more tactful in addressing the officers, to put it mildly, his words, as he describes them in his first amended complaint, nonetheless do not go so far as to constitute fighting words as a matter of law.

Several of the officers also argue that Mr. McCormick's words, conduct, or gestures did not constitute protected speech because Mr. McCormick concedes that at times he was merely testing his rights to see if the officers would violate such rights. Their theory is that Mr. McCormick's intent in making such gestures was not for any purpose of valid expression. The officers, however, spend little time on this argument and do not cite even a single case standing for such a proposition. Moreover, the fact that Mr. McCormick chose to test his rights was a form of expressing his opinion.

Lastly, the officers argue that on several occasions Mr. McCormick's protests crossed over the line from protected expression to interfering with police duties in violation of K.S.A. 21–3808(a) and/or disturbing the peace in violation of K.S.A. 21–4101(a).[14] Thus, they had the right to either arrest Mr. McCormick or threaten to do so. In response, Mr. McCormick argues that K.S.A. 21–3808(a) is unconstitutionally over broad but further argues that the court does not need to reach that issue because his allegations do not amount to a violation of either statute. The court agrees that if Mr. McCormick's

14. Although the officers made this argument in the adverse action/injury section of their papers, the court believes the issue is really whether Mr. McCormick's actions crossed the line from protected expression and speech to unprotected action that violated a Kansas statute.

allegations are assumed true and all reasonable inferences are drawn in favor of Mr. McCormick, as they must on this motion to dismiss, he did not violate the statutes.

In *State v. Huffman*, 228 Kan. 186, 612 P.2d 630 (1980), the Kansas Supreme Court construed K.S.A. 21–4101(a) as prohibiting only "speech within the limited category of fighting words." *Id.* at 192, 612 P.2d 630. The court has already determined that Mr. McCormick's words, as described in his first amended complaint, did not go so far as to amount to fighting words as a matter of law. Thus, based on his allegations, he did not violate the statute.

■ Whether Mr. McCormick violated the obstruction of official duty statute, K.S.A. 21–3808(a), is a closer call. The statute provides that it is illegal to knowingly and intentionally obstruct, resist or oppose any person in the discharge of official duty:

> (a) Obstructing legal process or official duty is knowingly and intentionally obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of official duty.

K.S.A. 21–3808(a). In *State v. Parker*, 236 Kan. 353, 690 P.2d 1353 (1984), the Kansas Supreme Court discussed the "essential nature" of the offense. *Id.* at 360, 690 P.2d at 1359. The court explained that the "use of actual force is not always necessary to constitute an offense," but there must be "some actual overt act of obstruction." *Id.* "To obstruct means to interpose obstacles or impediments, to hinder, impede, or in any manner intrude or pre-

vent." *Id.* In *State v. Latimer*, 9 Kan. App.2d 728, 687 P.2d 648 (1984), the Kansas Court of Appeals explicitly stated that section 21–3808 applies to oral statements of a defendant because "the apparent intent of the statute is to make criminal the willful obstruction by any means of an officer acting in the discharge of his official duty." *Id.* The court, quoting a Georgia case, stated that the statute is intentionally broad to cover actions which might not otherwise be unlawful, but which obstruct or hinder law enforcement officers in carrying out their duties. *Id.* The court qualified this statement by adding that not every action which incidentally hinders an officer is a crime; the accused must have willfully and knowingly hindered or obstructed the officer. *Id.* In short, then, obstruction of legal process or official duty requires conduct that "must have substantially hindered or increased the burden of the officer in carrying out his official duty." *Parker*, 236 Kan. at 364, 690 P.2d at 1362. Beyond that requirement, it appears that whether an obstruction has occurred depends on the particular facts of each case.

Turning to Mr. McCormick's allegations, it is clear that he has not alleged nor do his allegations establish that he "hindered or increased the burden of the officer in carrying out his official duty" during any of his protests. Mr. McCormick states that he challenged and opposed traffic stops, each time from a public sidewalk. As Mr. McCormick contends, it is reasonable to infer, from the allegation that Mr. McCormick was located on a public sidewalk, that he was not in very close proximity to the officers who were presumably conducting the traffic stop in the street.[15] Thus, the court cannot say that Mr.

---

15. Several officers argue that Mr. McCormick was within several feet of different traffic stops. On this motion to dismiss the court cannot address that argument because Mr.

McCormick does not make such an allegation. Of course, the officers can state this in an affidavit which the court may consider on a motion for summary judgment.

McCormick's allegations establish that he was violating the statute. Although defendants' evidence may ultimately prove to the contrary, at this stage the court concludes that Mr. McCormick has sufficiently alleged that he was engaged in protected activity during each encounter or protest described in the first amended complaint.

### Adverse Action/Injury

■ Mr. McCormick's allegations must next show that the officers' actions caused him "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Worrell,* 219 F.3d at 1212. During each of his protests or confrontations with officers, he alleges that the officers either threatened to arrest him or otherwise confronted him in a hostile manner.[16] The officers argue that an ordinary person would have felt no fear of any constitutional injury by such actions. They point out that courts recognize that some "threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations . . . ." *Thaddeus–X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999).

In *Thaddeus–X,* a case involving a retaliation claim made by a prisoner, the Sixth Circuit pointed out that the definition of "adverse action is not static across contexts." *Id.* The court noted that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before

an action against them is considered adverse." While the officers correctly note that the court stated that certain deprivations "are so de minimis that they do not rise to the level of being constitutional violations," the court added that "this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.*[17]

The question, then, is whether a person of ordinary firmness would be deterred from exercising his or her First Amendment right to orally challenge police officers if such officers threatened to arrest him or her. The court concludes that an ordinary person would be deterred from engaging in such conduct. That is, the court cannot say that the officers' threats of arrest, in the circumstances described above, are the sort of de minimis or inconsequential retaliatory act that would fail to state a claim. Instead, the court believes the threat of arrest by a police officer is exactly the sort of act that would deter a person of ordinary firmness from exercising his or her First Amendment right to orally challenge that officer.

### Motive

■ The third element of the *Worrell* test is whether "the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell,*

---

**16.** The only time Mr. McCormick alleges his injury is anything other than a threat of arrest is during his encounter with Officer Casagrande. He alleges his injury there was an unreasonable seizure by means of conduct previously described above. As noted above, the court will address that claim individually below.

**17.** Mr. McCormick argues that in *Poole v. County of Otero,* 271 F.3d 955 (10th Cir.2001), the Tenth Circuit "essentially" adopted the view that "actual injury results from the retal-

iation [itself]." The Tenth Circuit did make such a statement but it was made in a general sense. The court then proceeded to set forth the elements of a retaliation claim. The court noted that "a trivial or de minimis injury will not support a retaliatory prosecution claim." *Id.* It added that the "alleged injury should be one that 'would chill a person of ordinary firmness from continuing to engage in that activity.'" *Id.* Thus, it is clear that in the Tenth Circuit de minimis injuries do not support a First Amendment retaliation claim.

219 F.3d at 1212. The officers argue that Mr. McCormick has not alleged any facts that would establish that their alleged threats of arrest (or other action) were motivated by Mr. McCormick's exercise of First Amendment rights. However, drawing all reasonable inferences in favor of Mr. McCormick, as the court must do at this stage in the litigation, it is reasonable to infer that each of the threats of arrest was substantially motivated as a response to Mr. McCormick's exercise of constitutionally protected conduct—typically calling the officers names or protesting their traffic stops. Each threat came directly after Mr. McCormick took such action and, based on Mr. McCormick's allegations, there is no other plausible basis for the threats of arrest.[18] Thus, the court concludes that Mr. McCormick has stated a retaliation claim against each of the officers, and the officers' motions to dismiss these claim are therefore denied.

## Count II—Confrontation on the University of Kansas Campus

The court now turns to Mr. McCormick's First Amendment retaliation claim against Officer Casagrande. The circumstances surrounding this claim are described above. Officer Casagrande concedes that "flipping the bird" and blowing a "horn" have been found to be constitutionally protected activities. Mr. McCormick alleges that the adverse action was an unreasonable seizure by means of conduct previously described above. Officer Casagrande concedes that an unreasonable

seizure would constitute the sort of action that would deter a person of ordinary firmness from engaging in the protected activities in which Mr. McCormick engaged. He argues, however, that Mr. McCormick's allegations do not establish that he was unlawfully seized, and the court has held as such. Officer Casagrande also contends that to the extent Mr. McCormick alleges that he was nevertheless injured by Officer Casagrande's conduct, such injury must be characterized as de minimis. The court agrees.

Based on Mr. McCormick's allegations regarding the circumstances surrounding his encounter with Officer Casagrande, the court concludes Mr. McCormick's injury was de minimis. Unlike the other confrontations with police officers, Officer Casagrande is not alleged to have told Mr. McCormick that he was going to arrest him if he did not stop challenging him (or otherwise stop engaging in protected First Amendment activities).[19] While he did eventually yell obscenities at Mr. McCormick, according to Mr. McCormick's allegations, he did so only in response to Mr. McCormick calling him a "sick pig." Officer Casagrande should have maintained better control of his temper, but he neither attempted to use his police authority to suppress Mr. McCormick's activities nor did he strike or even threaten to abuse Mr. McCormick physically. Mr. McCormick felt free to and did leave the scene by choice; Officer Casagrande did not tell him to leave any more than he prevented him from doing so. In short, the court

---

18. The court believes the issue of whether Officer Farrar's and Officer Byrn's threats of arrest were in retaliation for accessing the municipal court and then later protesting the police action would have been much more difficult to decide if the officers developed their argument and pointed the court to case law in support of their position. The court, however, declines to make arguments for the officers.

19. Mr. McCormick does allege that at one point Officer Casagrande stated that he "could" arrest Mr. McCormick. But even drawing all reasonable inferences in favor of Mr. McCormick, it is not reasonable to infer that Officer Casagrande was actually threatening to arrest Mr. McCormick at that time.

concludes that the officer's remarks, even if inappropriately rude, would not have chilled a person of ordinary firmness from engaging in the constitutionally protected activity of expressing himself or herself to the police. Thus, Mr. McCormick did not suffer a constitutionally protected injury, and the court therefore grants Officer Casagrande's motion to dismiss this claim.

### iii. First Amendment Free Speech Claims

The first amended complaint includes four First Amendment free speech claims. Three of the claims (Counts XVII, XIX, and XXI) relate to Mr. McCormick's protest of the traffic stop by Officers Harvey and Hadl. For the same reasons discussed above, however, the court believes that Mr. McCormick should be entitled to only one claim based on the cumulative conduct of both officers during his protest on April 14, 2002. Thus, like the retaliation claim above, the court will proceed here on the assumption that Mr. McCormick brought one claim against both officers. The other claim (Count VII) relates to Mr. McCormick's protest of the traffic stop by Officers White and Souder on January 10, 2001. All of the claims allege that the officers terminated his right to free speech in a public forum—a sidewalk.

The officers argue the First Amendment free speech claims should be dismissed because they are duplicative of his First Amendment retaliation claims. The officers, however, cite no case law to support their argument. They also do not explain why the allegations cannot support both a First Amendment retaliation claim and a First Amendment free speech claim. It seems possible, at least, that an arrest or threatened arrest could constitute a prior restraint, something the first amendment clearly prohibits. *See, e.g., United States v. Moore*, 215 F.3d 681 (7th Cir.2000) (noting that "an arrest might implicate First Amendment rights ...," but concluding

that the arrest in question did not act as a prior restraint). Whether this situation could give rise to such a claim is unclear; however, without citation to case law explaining why the claim is not cognizable, this court declines to address this claim further at this stage in the litigation. Accordingly, the motions to dismiss these claims are denied.

### iv. Taking Property Without Due Process Claims

Count X of the first amended complaint is labeled a "taking property without due process." It alleges that during the January 10, 2002 protest and subsequent arrest, Officer White took Mr. McCormick's micro-cassette recorder without affording him "the due process of law guaranteed him by the Fourth Amendment...." Officer White seeks to dismiss the claim under the *Parratt/Hudson* doctrine. In response, Mr. McCormick states that his claim is both a procedural and substantive due process claim. He also contends that Officer White's analysis does not address whether Mr. McCormick's allegations (that his property was taken in a violent and aggressive manner, for no legal reason, and without notice or opportunity to be heard sufficiently) alleges a procedural or substantive due process claim.

The court agrees that his allegations state a Fourth Amendment substantive due process claim—his unreasonable seizure claim (Count IX) discussed above. Thus, because the court has already concluded that Mr. McCormick has stated such a claim, the court will interpret this claim as a procedural due process claim.

The court agrees with Officer White that the *Parratt/Hudson* doctrine precludes such a claim in these circumstances. Random and unauthorized deprivation of property is not a cognizable claim under § 1983 when a state's post-depriva-

tion remedies are adequate to protect a plaintiff's procedural due process rights. *Hudson v. Palmer*, 468 U.S. 517, 530–33, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 330–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In this action, Mr. McCormick alleges that during his arrest his micro-cassette recorder was taken from him by Officer White and had not been returned as of the date he filed this action. Mr. McCormick, however, does not challenge the validity of the procedures used to confiscate his micro-cassette recorder. Instead, his primary complaint (in addition to the aggressive manner in which his recorder was taken) is that Officer White had no "legal reason" or "legal justification" for taking the recorder. He therefore states a claim (under the Kansas Tort Claims Act or for conversion) cognizable under state, not federal law. *Parratt*, 451 U.S. at 541, 101 S.Ct. 1908. In short, then, because post-deprivation tort remedies were in fact available to Mr. McCormick in state court, his constitutional right to due process was not violated. *Hudson*, 468 U.S. at 530–33, 104 S.Ct. 3194. As such, the court grants Officer White's motion to dismiss this procedural due process claim.

**b. Clearly Established Law**

Having concluded that Mr. McCormick has pled allegations in some of his claims, that if proven, amount to a constitutional violation, the court turns to the second step of the qualified immunity analysis— determining whether the rights allegedly violated were "clearly established at the time of the defendant's unlawful conduct."

*Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Here, none of the officers attempt to dismiss Mr. McCormick's claims on this basis. Thus, for purposes of this motion to dismiss the court will presume the law was clearly established. Accordingly, Mr. McCormick has stated a claim on Counts III–IX, XVI, XVII,[20] and the motions to dismiss those claims are denied.

**C. Motion to Dismiss the City of Lawrence**

Count XIV of the first amended complaint is an "unconstitutional practice or custom" claim. It alleges that the City of Lawrence "implemented and maintained an express or implied policy or custom" in its police force of "expressly or impliedly authorizing, permitting, allowing or encouraging its police officers" to interfere with or prohibit the exercise of First Amendment rights. The City of Lawrence argues it should be dismissed from this action because Mr. McCormick has failed to state a claim that any officer deprived him of his First Amendment rights or retaliated against him for exercising his First Amendment rights. In other words, even if the City of Lawrence maintained an unconstitutional policy, because Mr. McCormick has not alleged an injury he cannot bring a claim against the City of Lawrence. Because the court has concluded that Mr. McCormick has stated a claim against at least one of the officers of the City of Lawrence, the City of Lawrence's motion to dismiss is denied.

**D. Motion to Dismiss the Kansas Attorney General Defendants**

Count XI of the first amended complaint is a "deprivation of Liberty by

---

**20.** For simplicity, the court will assume Mr. McCormick's retaliation and First Amendment claims that survive are Counts XVI and XVII. These claims are brought against both Officers Hadl and Harvey. Mr. McCormick's first amended complaint is hereby amended to conform with the court's ruling. The claims for relief set forth in Counts XVIII–XXI are dismissed as redundant.

Fabricated Evidence" claim against M.J. Willoughby, Count XII is a retaliation claim against M.J. Willoughby, David Harder, and Shelly Welch, and Count XIII is a "First (and Fourteenth) Amendment Speech and Association" claim against M.J. Willoughby, David Harder, and Shelly Welch.

The Attorney General defendants (M.J. Willoughby, David Harder, and Shelly Welch) argue the claims against them should be dismissed because Mr. McCormick lacks standing to bring such claims against them or, alternatively, they are entitled to either absolute or qualified immunity.

This court discussed standing and immunity issues in a recent March 7, 2003, Memorandum and Order ("M & O") (Doc. 171), granting the Attorney General defendants' motion to dismiss the claims of Robert and Merrily Coburn.[21] Thus, the court will not reiterate the framework for addressing those issues; instead, it will incorporate that discussion here.

With regard to the standing issue, the Attorney General defendants contend that the only action alleged in the first amended complaint to have been taken by the Attorney General defendants was issuing an administrative subpoena to Merrily Coburn. They argue that Mr. McCormick lacks standing to complain of such action. The court cannot agree that Mr. McCormick's allegations are so limited.

Liberally construing the allegations in the *pro se* first amended complaint, and taking into account that this is a motion to dismiss, the court concludes that Mr. McCormick has standing to sue each of the Attorney General defendants. Mr. McCormick has alleged that Ms. Willoughby fabricated evidence on which to base a complaint to the Consumer Protection Di-

vision of the Office of the Attorney General. He also alleges that she conspired with Mr. Harder and Ms. Welch to subpoena Ms. Coburn to be interviewed by them and that during the interview they "threatened" Ms. Coburn. He alleges that such actions were taken in retaliation for Mr. McCormick's association with the Coburns and providing Ms. Coburn with background knowledge and limited help on her lawsuit. Mr. McCormick also alleges that such actions were taken to deter the Coburns from associating with him. Such allegations are sufficient to support an injury in fact—deprivation of his First Amendment right of association and his right be free from retaliation for exercising his First Amendment rights—that is derived from the Attorney General defendants' actions.

### Absolute Immunity

The Attorney General defendants next argue that even if Mr. McCormick has standing to bring claims against them, they are entitled to immunity, either absolute or qualified. As this court pointed out in its March 7, 2003 M & O, in analyzing the immunity issue the first step is to characterize the government activity. *Clulow v. State of Okl.*, 700 F.2d 1291, 1298–99 (10th Cir.1983), *overruled on other grounds by Newcomb v. Ingle*, 827 F.2d 675 (10th Cir.1987). In determining whether particular acts of government officials are eligible for immunity, the courts apply a "functional approach … which looks to the nature of the function performed, not the identity of the actor who performed it." *Malik v. Arapahoe County Dept. of Social Servs.*, 191 F.3d 1306, 1314 (10th Cir.1999) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)).

---

**21.** The magistrate judge had previously granted a motion filed by Robert and Merrily Co-

burn to join Mr. McCormick's retaliation claim and an accompanying pleading.

■ In this action, M.J. Willoughby was functioning as a complaining witness. Mr. McCormick alleges that Ms. Willoughby fabricated evidence on which to base a complaint and then filed a complaint with the Consumer Protection Division of the Office of the Attorney General which, in turn, spurred an investigation of Mr. McCormick's involvement in *Coburn v. Nordeen*. Ms. Welch and Mr. Harder were functioning as investigators of an alleged Consumer Protection Act violation by Mr. McCormick for the unauthorized practice of law. Based on these functions, the court believes that M.J. Willoughby, in her capacity as a complaining witness, is potentially entitled to qualified immunity while Ms. Welch and Mr. Harder, both in a capacity of investigating a case allegedly involving the unauthorized practice of law, are entitled to absolute immunity.[22]

As this court explained in detail in its March 7, 2003 M & O, the Tenth Circuit, like many other circuits, has held that absolute prosecutorial immunity extends to "bar officials charged with the duties of investigating, drawing up, and presenting cases involving attorney discipline," and that such officials "enjoy absolute immunity from damage claims for such functions." *Clulow*, 700 F.2d at 1298 (citing *Simons v. Bellinger*, 643 F.2d 774 (D.C.Cir.1980); *Kissell v. Breskow*, 579 F.2d 425 (7th Cir. 1978); *Ginger v. Wayne County Circuit Court*, 372 F.2d 621 (6th Cir.1967); *Clark v. Washington*, 366 F.2d 678 (9th Cir. 1966)). Thus, for the same reasons discussed in detail in the March 7, 2003 M & O, the court concludes that Mr. Harder and Ms. Welch are entitled to absolute immunity.

■ Ms. Willoughby, however, does not qualify for such immunity. Mr. McCormick alleges that she fabricated evidence on which to base a complaint and then filed a complaint with the Consumer Protection Division. Such actions could have been undertaken by any complaining witness. Thus, the court must undertake a qualified immunity analysis.

## Qualified Immunity

The qualified immunity framework is set out above and in the court's March 7, 2003 M & O; therefore, the court will not repeat it here. Instead, it will proceed directly to the question of whether, under an ordinary Rule 12(b)(6) analysis, Mr. McCormick has asserted a Constitutional violation.

Mr. McCormick brings three separate claims against Ms. Willoughby: Count XI is a "deprivation of liberty by fabricated evidence" claim, Count XII is a First Amendment retaliation claim, and Count XIII is a "First Amendment (and Fourteenth) Amendment Speech and Association" claim.

■ Count XII is a retaliation claim alleging that Ms. Willoughby "launch[ed] a baseless, groundless, fabricated inquisition" into whether he was practicing law without a license in retaliation for exercising his First Amendment rights—associating with Robert and Merrily Coburn, expressing his opinions to them, and serving process in Ms. Coburn's lawsuit. The court outlined the elements of this claim in detail above and in its March 7, 2003 M & O.

22. To the extent that Mr. McCormick is alleging that Ms. Willoughby was involved in initiating the subpoena of Ms. Coburn or initiating the questioning of her, this court believes Ms. Willoughby would be entitled to absolute immunity for the same reasons as Mr. Harder and Ms. Welch. This court does not believe courts should dictate to the Office of the Kansas Attorney General who can be involved in a particular investigation regarding the unauthorized practice of law.

Ms. Willoughby does not seriously argue that such allegations fail to state a retaliation claim. She also does not make a specific argument as to why the right to be free of such retaliation was not clearly established. Thus, the court concludes that based on his allegations, Mr. McCormick has stated a claim against Ms. Willoughby. As this court explained in detail in its March 7, 2003 M & O, associating for the purposes of providing general help on a lawsuit constitutes a protected activity.[23] And, obviously launching an investigation of a person for practicing law without a license would chill a person of ordinary firmness from continuing to provide help. Finally, it is reasonable to infer from his allegations that Ms. Willoughby launched the investigation in response to Mr. McCormick's association with the Coburns and his involvement in Ms. Coburn's lawsuit. Thus, based on Mr. McCormick's allegations, Ms. Willoughby is not entitled to qualified immunity and her motion to dismiss this claim is therefore denied.

 Ms. Willoughby also does not directly address Mr. McCormick's First Amendment association and free speech claim. In substance, the allegations in this claim are nearly identical to those in the retaliation claim. Nonetheless, Mr. McCormick argues that he states a claim because Ms. Willoughby's actions prevented him from associating with Ms. Coburn for the purpose of helping her with her lawsuit. Thus, he argues that under *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and its progeny, he has alleged a constitutional violation of a clearly established right. The court discussed the application of *Button* and *Owens* in its March 7, 2003 M & O. There, the court explained that such cases do provide a right to associate for the purposes of

obtaining general legal help on a lawsuit. And, of course, at this stage of the litigation the court is limited to considering Mr. McCormick's allegations that he was merely providing general legal help such as serving process and not attempting to practice law without a license. Moreover, Ms. Willoughby does not address Mr. McCormick's argument. Consequently, the court concludes that Mr. McCormick has stated a First Amendment right of association claim and the right to associate was clearly established at all times relevant to this lawsuit. As such, Ms. Willoughby is not entitled to qualified immunity and her motion to dismiss this claim is denied.

 Mr. McCormick's last claim is labeled a "deprivation of liberty by fabricated evidence" claim. The substance of the claim, however, does not discuss how Mr. McCormick's liberty was deprived by Ms. Willoughby's actions. Instead, it first states that her actions (he alleges she fabricated evidence, filed a complaint against him, and caused his friend Merrily Coburn to be questioned in a threatening manner) attacked his right of association and expression. Specifically, it caused the Coburns to greatly reduce or stop their association with him. He states this was "in violation of [his] right to be free from any damage to his Liberty caused by fabricated evidence, all of which infringed upon [his] Liberty and First Amendment rights, abrogated [his] ability to freely associate with whomever he chooses and express his opinion to whomever he chooses, oppressed [him], stymied [his] primary occupation, to wit: advocacy of Constitutional rights, harassing [him], provoking [him] to wrath, and caused [him] grave stress, anxiety and consternation."

---

**23.** Specifically, the Tenth Circuit held, in *Owens v. Rush*, 654 F.2d 1370 (10th Cir.1981), that First Amendment protection is afforded to activities involving the assistance of litigation aimed at vindicating civil rights. *Id.* at 1379.

In his response to the motion to dismiss, Mr. McCormick cites to *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), alleging that it stands for the proposition that it is unconstitutional to fabricate evidence in order to deprive a person of his or her Liberty. He also cites to *Zahrey v. Coffey,* 221 F.3d 342 (2d Cir.2000). Both cases involved the deprivation of liberty without due process of law under the Fifth and Fourteenth Amendments.[24] Thus, it is clear that Mr. McCormick is attempting to state a similar claim here. The problem in this case, however, is that Mr. McCormick has not alleged a loss of liberty comparable to that in *Buckley* or *Zahrey.* In *Buckley,* the plaintiff spent three years in prison as a result of the fabrication of evidence while in *Zahrey* the plaintiff spent eight months incarcerated as a result of such conduct. In this action, by contrast, Mr. McCormick alleges that he was deprived of his freedom to associate with the Coburns and express his ideas to them. He does not cite a case in which a court found this to be a deprivation of liberty within the meaning of the Fifth and Fourteenth Amendments. Moreover, he has brought a separate claim for such deprivations. Thus, he has failed to allege a deprivation of liberty sufficient to support a claim. Ms. Willoughby, therefore, is entitled to qualified immunity and her motion to dismiss this claim is granted.

To recap, Mr. Harder and Ms. Welch are absolutely immune from Mr. McCormick's claims; thus, they are dismissed from this lawsuit. Ms. Willoughby, however, was a complaining witness entitled only to qualified immunity. She is afforded such immunity on Mr. McCormick's deprivation of liberty without due process claim. But, based on Mr. McCormick's allega-

tions, she is not entitled to such immunity on his First Amendment retaliation and association/free speech claims. Thus, Counts XII and XIII survive.

**E. Motions to Dismiss Douglas County District Attorney, Assistant District Attorney, and Officer James White**

Count XXII of the first amended complaint is a conspiracy claim, Count XXIII is an "unreasonable seizure" claim, Count XXIV is a "deprivation of Liberty by fabricated evidence" claim, Count XXV is a "retaliatory, vindictive or harassing prosecution" claim, and Count XXVI is an "access to courts" claim. Each claim is brought against Officer James White, Douglas County District Attorney Christine Kenney, and Assistant Douglas County District Attorney Bradley Burke in their individual capacities. Mr. McCormick alleges that these three defendants conspired to retaliate against him for exercising his first amendment rights by using a falsified affidavit (an affidavit which allegedly included six different false facts) and criminal complaint to obtain probable cause and have Mr. McCormick arrested.

Ms. Kenney and Mr. Burke filed a motion to dismiss, arguing that they are entitled to immunity, either absolute or qualified. Officer White filed a separate motion to dismiss that argues that the claims should be dismissed or stayed pursuant to *Heck v. Humphrey.*

 Initially, the court concludes, as Ms. Kenney and Mr. Burke argue, that Mr. McCormick has failed to state a conspiracy claim against the defendants. To state a conspiracy claim under § 1983, a plaintiff must allege specific facts showing an agreement and concerted action

---

**24.** Although the Supreme Court did not discuss the actual claim alleged in *Buckley,* the Seventh Circuit's subsequent opinion on re-
mand makes clear that the case involved such a claim.

amongst defendants. *See, e.g., Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504 (10th Cir.1998); *Hunt v. Bennett,* 17 F.3d 1263, 1266 (10th Cir.1994); *Gallegos v. City and County of Denver,* 984 F.2d 358, 364 (10th Cir.1993). Mr. McCormick alleges that Ms. Kenney, Mr. Burke, and Officer White conspired to retaliate against him by "us[ing] false information in a warrant affidavit." He alleges the affidavit, signed and sworn to by Officer White, contained at least six false facts regarding the events surrounding his arrest on January 10, 2001. He also alleges that Mr. Burke swore a criminal "complaint under oath," thereby "instigating [a] false and falsely premised 'disorderly conduct' charge against" him. With all of these actions ultimately causing him to appear in court to defend himself against the criminal charge. Based on these allegations, the court does not believe Mr. McCormick has alleged specific facts to show that a conspiracy took place nor does he provide any circumstantial evidence from which it could be inferred there was a conspiracy. He has failed to allege specific facts from which it could be inferred that there was an agreement and concerted action amongst the three defendants. Instead, he merely makes conclusory allegations regarding the conspiracy. Conclusory allegations will not suffice on a § 1983 claim. *Wise v. Bravo,* 666 F.2d 1328, 1333 (10th Cir.1981). Thus, Mr. McCormick has failed to state a conspiracy claim and Count XXII is therefore dismissed.

Having determined that Mr. McCormick's conspiracy claim is deficient, the court turns to his other claims: an unreasonable seizure claim, a deprivation of liberty by fabricated evidence claim, malicious prosecution claim, and an access to courts claim.

Ms. Kenney and Mr. Burke allege they are entitled to immunity, either absolutely or qualifiedly, on each of the claims.

**Absolute Immunity**

In *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court recognized that prosecutors are entitled to absolute immunity for functions that are "intimately associated with the judicial phase of a criminal process." *Id.* at 430, 96 S.Ct. 984. The Supreme Court has since reaffirmed that a prosecutor is entitled to absolute immunity but only when serving in an advocacy role. *Burns v. Reed,* 500 U.S. 478, 492, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). In *Burns,* the Court granted absolute immunity for a prosecutor's role in applying for a search warrant and presenting evidence in support of it. *Id.* at 492, 111 S.Ct. 1934. It reiterated:

> We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. In *Kalina v. Fletcher,* 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), the Court held that a prosecutor's activities in preparing and filing information and a motion for an arrest warrant were protected by absolute immunity. *Id.*

█ These cases make it clear that it is the function being performed that determines whether a prosecutor is entitled to absolute or qualified immunity. *Kalina,* 522 U.S. at 129, 118 S.Ct. 502. A prosecutor acting as an advocate for the state is afforded absolute immunity. *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. On the other

hand, a "prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.* (citation omitted). Such activities, which are entitled only to qualified immunity, include: giving legal advice to police, *Burns,* 500 U.S. at 492–96, 111 S.Ct. 1934, holding a press conference or allegedly fabricating evidence during the preliminary investigation of an unsolved crime, *Buckley,* 509 U.S. at 275–78, 113 S.Ct. 2606, and personally attesting to the truthfulness of statements included in a certification, *Kalina,* 522 U.S. at 129, 118 S.Ct. 502.

■■■■■ In this action, Mr. McCormick has not alleged Ms. Kenney took any actions other than acting as an advocate for the state. Indeed, apart from his allegation that she was part of a conspiracy, he alleges only that she utilized an affidavit to falsely create probable cause against him.[25] Significantly, he does not allege, however, that Ms. Kenney swore to the truthfulness of that affidavit or otherwise functioned as an investigator. The law is clear that a prosecutor is absolutely immune for preparing a criminal complaint and in seeking an arrest warrant. *Roberts v. Kling,* 144 F.3d 710 (10th Cir.1998), *cert. denied,* 525 U.S. 1139, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999); *see also Snell v. Tunnell,* 920 F.2d 673 (10th Cir.1990) (explaining that "[a]bsolute immunity has its costs because those with valid claims against dishonest or malicious government officials are denied relief."). They are also immune from charges that they failed to sufficiently investigate a complaint before filing charges.

*Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1489 (10th Cir.1991). In short, then, the court concludes that Ms. Kenney's involvement was limited to functioning as an advocate for the state in bringing charges against Mr. McCormick related to the events of January 10, 2001. Thus, the court concludes that Ms. Kenney is entitled to absolute prosecutorial immunity for her alleged involvement.

■■■■■ On the other hand, the first amended complaint does allege Mr. Burke potentially played a role apart from acting as an advocate: he signed a criminal complaint under penalty of perjury. In *Roberts,* 144 F.3d at 711, the Tenth Circuit, relying on the Supreme Court's decision in *Kalina,* 522 U.S. at 129, 118 S.Ct. 502, held that a prosecutor is entitled only to "qualified immunity for his execution of the criminal complaint, by which he affirmed the truth of the facts set forth in that document to the best of his information and belief." *Id.* at 711. In reaching that decision, the court "[a]ssum[ed] without deciding that the investigator acted as a complaining witness in testifying to the truth of the statements contained within the criminal complaint, a role which would deny his conduct the protection of absolute immunity under *Kalina.*" *Id.* Here, too, because Mr. Burke does not argue to the contrary, the court will assume without deciding that he similarly under took such a role. Thus, he is not entitled to absolute immunity, only qualified immunity, for signing the criminal complaint under penalty of perjury. Any other action he took is absolutely immune for the same reasons as Ms. Kenney.

---

**25.** It could be argued, in fact, that Mr. McCormick has not alleged that Ms. Kenney was personally involved at all. His allegations of her involvement are limited to general allegations that she undertook some action along with Mr. Burke and Officer White. He does not allege any particular actions by her. A § 1983 claim requires factual allegations of a defendant's personal involvement. *See, e.g., Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996). Thus, his claim could likely be dismissed on that alternative basis.

### Qualified Immunity

The first amendment complaint includes the following claims: an unreasonable seizure claim (Count XXIII), a deprivation of liberty by fabricated evidence claim (Count XXIV), retaliatory prosecution claim (Count XXV), and an access to courts claim (Count XXVI). The qualified immunity framework set out above applies here as well, of course. Thus, the court proceeds directly to the question of whether, under an ordinary Rule 12(b)(6) analysis, Mr. McCormick has asserted a Constitutional violation against Mr. Burke.

His unreasonable seizure claim alleges that Officer White, Mr. Burke, and Ms. Kenney violated his Fourth Amendment right to be free of unreasonable seizure. More specifically, he alleged that they violated his Fourth Amendment right to be free of an unreasonable seizure by signing a criminal complaint under penalty of perjury despite knowing that the complaint contained false statements. Mr. McCormick argues that such a right was established by *Kalina*, 522 U.S. at 122, 118 S.Ct. 502 and *Roberts*, 144 F.3d at 711. Defendants do not dispute this. Thus, for purposes of this motion, the court presumes the Supreme Court or Tenth Circuit recognizes such a claim. Also, taking Mr. McCormick's allegations as true, the court believes he has established that his constitutional right was violated.

The deprivation of liberty by fabrication of evidence claim alleges that Officer White, Mr. Burke, and Ms. Kenney violated his Fifth or Fourteenth Amendment right to due process by fabricating evidence leading to his arrest. Mr. McCormick cites a Second Circuit case examining such a claim. *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir.2000). Again, in the absence of argument to the contrary by de-

fendants, the court concludes that the Tenth Circuit would recognize such a claim. Also, taking Mr. McCormick's allegations as true, the court believes he has established that his constitutional right was violated.

The retaliation claim, labeled a "retaliatory, vindictive or harassing prosecution claim," alleges that Officer White, Mr. Burke, and Ms. Kenney retaliated against him for exercising his First Amendment rights by subjecting him to "harassing and vindictive prosecutions." Such prosecutions allegedly were undertaken without probable cause and through the use of a materially false affidavit and sworn criminal complaint. The court interprets this claim as a First Amendment retaliation claim.[26] Like the other two claims, the court believes Mr. McCormick's allegations are sufficient to show that his constitutional rights were violated.

■ The last claim is a First Amendment access to courts claim which alleges that Officer White, Mr. Burke, and Ms. Kenney "did knowingly and intentionally interfere with, hinder and impede [his] right to access the courts in the host of cases in which [he] is doing so by taking [his] time and attention away from such pursuits with the filing and maintenance of . . . falsely premised and phony 'disorderly conduct' charge." Even assuming Mr. McCormick's allegations are true, the court concludes that such allegations do not support a § 1983 access to courts claim.

Mr. McCormick has not alleged an injury in fact to satisfy the case or controversy requirement of Article III of the Constitution. An injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends*

---

**26.** To the extent that Mr. McCormick disagrees with this interpretation, he may file a motion to alter or amend under Fed.R.Civ.P. 59.

*of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180–181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In this action, Mr. McCormick states that his constitutional right to access the courts has been "interfered with, hindered and impeded." However, he does not list particular cases in which he has been unsuccessful (or otherwise hindered) as a result of having to defend himself against the disorderly conduct charge. Such general and conclusory statements of injury do not amount to a concrete and particularized injury giving rise to a § 1983 access to courts claim. *Cf. Ferguson v. New Mexico Corrections Dept.,* 38 Fed.Appx. 561, 563 (10th Cir.2002)(unpublished opinion)(affirming the dismissal of an inmate's § 1983 access to courts claim because he did not allege "that his previous civil suit was unsuccessful" or "offer facts to show that his ability to pursue nonfrivolous litigation was hindered" by the prison's allegedly deficient legal access program). In *Ferguson,* the court pointed out that although pro se pleadings are construed liberally, conclusory allegations are not enough. *Id.* at 563 (citing *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991)). Accordingly, the court concludes that Mr. McCormick has failed to state an access to courts claim and, therefore, the motions to dismiss this claim are granted.

■ Having determined that Mr. McCormick's allegations support three constitutional claims—unreasonable seizure, deprivation of liberty by fabrication of evidence, and First Amendment retaliation—the court must determine whether the rights violated were clearly established. The Tenth Circuit has instructed that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201, 121 S.Ct. 2151. Mr. McCormick alleges that the prosecutors and police fabricated evidence and then used that evidence to obtain probable cause to have him arrested. His allegations, then, are very broad. Thus, at this stage in the litigation the court believes it is sufficient to state that there is a long line of Supreme Court cases that inform prosecutors that the knowing use of false evidence is unconstitutional. *Zahrey v. Coffey,* 221 F.3d 342, 355 (2d Cir.2000) (citing *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935)). As the Second Circuit noted, prosecutors should be aware that fabricating evidence in an investigative role violates the standards of due process and that a resulting loss of liberty is a denial of a constitutional right. *Id.* The same is true if that fabrication results in an unlawful seizure or if the evidence is fabricated in retaliation for exercising First Amendment rights. Thus, the court must conclude that the rights alleged to have been violated were clearly established. As such, Mr. Burke and Officer White are not entitled to qualified immunity on Counts XXIII, XXIV, and XXV.

### *Heck v. Humphrey*

■ Finally, Officer White argues that Mr. McCormick's remaining claims (First Amendment retaliation, unreasonable seizure, and deprivation of liberty caused by fabrication of evidence) should be dismissed under *Heck v. Humphrey.* The court previously applied the doctrine to Mr. McCormick's claims against Officers White and Souder relating to their involvement in the events of January 10, 2001. In that connection, the court concluded that Heck did not bar his unreasonable seizure claims.

Unlike the unreasonable seizure claims relating to Mr. McCormick's arrest, these claims appear to implicate the concerns underlying *Heck.* Namely, they would

"necessarily imply the invalidity of any conviction that might" result from prosecution of the pending disorderly conduct charge. *Beck*, 195 F.3d at 557.

The court finds the analysis in *Duamutef v. Morris*, 956 F.Supp. 1112, 1116 (S.D.N.Y.1997), instructive. In *Morris*, the plaintiff brought a First Amendment retaliation claim alleging that he was prosecuted with false testimony in order to retaliate against him for his exercise of his First Amendment rights. The court dismissed the claim under *Heck*. It noted that a retaliation claim cannot be sustained "when the criminal prosecution was supported by probable cause." *Id.*[27] The court then reasoned that "[b]ecause plaintiff's retaliation claim would depend upon his demonstrating an absence of probable cause supporting the charges against him, that claim would necessarily call into question the validity of his conviction." *Id.* Finally, the court concluded that "[t]he rule announced in *Heck* is designed to avoid such 'parallel litigation over the issues of probable cause and guilt....'" *Id.* (quoting *Heck*, 512 U.S. at 484, 114 S.Ct. 2364).

Applying this analysis to Mr. McCormick's claims here yields a similar result. Mr. McCormick's retaliation claim (as well as his unreasonable seizure and deprivation of liberty without due process claims) depends upon him establishing an absence of probable cause supporting the charges against him. Specifically, to succeed on his unreasonable seizure claim, Mr. McCormick must prove that the prosecutor lacked probable cause to arrest him.

Obviously, such proof would imply the invalidity of any conviction. Similarly, to succeed on his fabrication of evidence claim, he must establish that the prosecutor fabricated evidence to have him arrested. If he could have been arrested despite the fabrication, his claim will not stand. Again, such proof would imply the invalidity of any conviction. Finally, to succeed on his First Amendment retaliation claim, Mr. McCormick must necessarily establish that Officer White, Mr. Burke, and Ms. Kenney fabricated evidence to create probable cause to have him arrested—that is his alleged injury. Such proof would also imply the invalidity of any conviction obtained against Mr. McCormick. Such claims, therefore, would imply the invalidity of any conviction against Mr. McCormick. That is precisely what the rule in *Heck* seeks to avoid. Thus, the court concludes that these three claims should be dismissed without prejudice under *Heck*. *Beck*, 195 F.3d at 560 n. 5 (noting that claims should be dismissed without prejudice under *Heck* ).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff Dale McCormick's motion for summary judgment (Doc. 19) is denied without prejudice. Vince Casagrande's motion to dismiss (Doc. 28) is granted. Ken Farrar and Mike Byrn's motion to dismiss (Doc. 30) is denied. The City of Lawrence's motion to dismiss (Doc. 34) is denied. James White and Leo Souder's motion to dismiss is granted as to Count X (taking property without due process of law claim), Count

---

**27.** In support of this proposition, the court quoted the Second Circuit's opinion in *Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2d Cir. 1992) ("An individual does not have the right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government."). It also cited to *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir.1995) (upholding dismissal of First Amendment retaliation claim: "if the officer ... had probable cause ... then we will not examine the officer's underlying motive in arresting and charging the plaintiff."), *cert. denied*, 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

XXII (conspiracy claim) and Count XXVI (First Amendment access to courts claim) and granted without prejudice as to Count XXIII (unreasonable seizure claim), Count XXIV (deprivation of liberty by fabrication of evidence), and Count XXV (retaliatory prosecution claim) but is denied as to the remaining claims against Officers White and Souder. Sam Harvey and Susan Hadl's motion to dismiss (Doc. 40) is denied. Gerard Little's motion to dismiss (Doc. 42) is granted. Gill Crouse's motion to dismiss (Doc. 44) is denied. Chris Mann's motion to dismiss (Doc. 46) is denied. Christine Kenney and Bradley Burke's motion to dismiss (Doc. 52) is granted as to all claims against Ms. Kenney, and Count XXII (conspiracy claim) and Count XXVI (First Amendment access to courts claim) against Mr. Burke. It is also granted without prejudice as to Count XXIII (unreasonable seizure claim), Count XXIV (deprivation of liberty by fabrication of evidence), and Count XXV (retaliatory prosecution claim) against Mr. Burke. M.J. Willoughby, David Harder, and Shelly Welch's motion to dismiss (Doc. 58) is granted as to all claims against Mr. Harder and Ms. Welch, and Count XI (deprivation of liberty by fabricating evidence) against Ms. Willoughby but is denied as to the remaining claims against Ms. Willoughby.